UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


FILED
APR 16 2014
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | Criminal No. 13-0184-02 (ESH) |
| : | |
| : | VIOLATION: |
| **v.** : | 18 U.S.C. § 201(c)(1)(A) |
| : | (Payment of a Gratuity to a |
| : | Public Official) |
| **ANTHONY R. CHENG JR.,** : | |

## STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, **ANTHONY R. CHENG, JR.**, and the United States agree and stipulate that, at all relevant times:

### Relevant Entities and Individuals

1. **ANTHONY R. CHENG, JR.**, was the son of Anthony C.Y. Cheng Sr., and owned and operated a bus company that provided interstate transportation to the public from Washington, D.C., to New York, NY.

### The District of Columbia Taxicab Commission

2. The District of Columbia Taxicab Commission ("DCTC") was a subordinate agency within the executive branch of the District of Columbia government with exclusive authority for intrastate regulation of the taxicab industry. The DCTC, among other things, established criteria, standards, and requirements for obtaining a taxicab license, including the licensing of owners, operators, companies, associations, and fleets. It also established licensing

fees. The DCTC was comprised of nine members. Five were members of the public and three were from the industry. Those members served for five-year terms and were appointed by the Mayor of the District of Columbia with the advice and consent of the District of Columbia Council. The ninth member was the chairperson, who was appointed by and served at the pleasure of the Mayor.

3. In order to operate a taxicab company in the District of Columbia, applicants were required to secure a Public-Vehicle-For-Hire Operator's license (hereinafter "Operating Authority License") from the DCTC. Generally, applicants were required to provide letters vouching for their sobriety, honesty, and general good character. The applicants were also required to pass a criminal background check and the "clean hands" requirement (stating that the applicant was current on the payment of all local taxes and had no outstanding fines).

4. On or about November 25, 2008, the DCTC imposed a legislatively mandated moratorium that prohibited the issuance of any new Operating Authority Licenses to operate any new taxicab companies, taxicab associations, limousine companies, and independently operated (single-vehicle) limousine operations. The moratorium was set to expire on or about November 25, 2010, but was extended through at least on or about September 30, 2011.

5. From on or about July 7, 2007, through on or about April 26, 2011, Public Official Number One was the Chairperson of the DCTC, and the chief administrative officer in charge of the organization and administration of the DCTC. As part of his official duties and responsibilities, Public Official Number One had the discretion and authority to issue licenses to operate multi-vehicle taxicab companies in the District of Columbia.

### The District of Columbia Department of Consumer and Regulatory Affairs

6.     The District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"), an agency of the District of Columbia government, was responsible for protecting the health, safety, economic interests, and quality of life of residents, businesses, and visitors in the District of Columbia. The DCRA issued licenses and permits, conducted inspections, enforced building, housing, and safety codes, regulated land use and development, and provided consumer education and advocacy services.

7.     District of Columbia Municipal Code Regulations required that all property owners obtain a Certificate of Occupancy to ensure that the use of buildings, structures and land in the District of Columbia conformed to the Zoning Regulations, and to the provisions of the District of Columbia Building Code. Generally, a Certificate of Occupancy was required to use a building, structure and land in the District of Columbia for any purpose other than a single-family dwelling. Therefore, any building that housed a multi-vehicle taxicab company in the District of Columbia was required to have a Certificate of Occupancy.

### Defendant ANTHONY R. CHENG, JR.'s Interest in Taxicab Operations

8.     On or about January 25, 2011, defendant **ANTHONY R. CHENG, JR.**, and Anthony C.Y. Cheng Sr. met with Public Official Number One, who was by then working in cooperation with the Federal Bureau of Investigation, to discuss taxicab-related business opportunities in the District of Columbia and the method by which **ANTHONY R. CHENG, JR.**, could obtain licenses for multi-vehicle taxicab companies while the moratorium was in place in Washington, D.C. During that conversation, Public Official Number One stated, "Your Dad has told me under no uncertain terms that if I helped him start a towing company, he'll give me ten

percent of what he makes."

9.   On or about January 27, and January 28, 2011, defendant **ANTHONY R. CHENG, JR.**, spoke to Public Official Number One by telephone and discussed the names for his two multi-vehicle taxicab companies for which Public Official Number One would assist in obtaining Operating Authority Licenses. Public Official Number One advised and discussed with defendant **ANTHONY R. CHENG, JR.**, of the need to make a "contribution" of not more than $1500, which Public Official Number One stated Public Official Number One had already paid to other individuals in order to obtain backdated documents and to have those documents entered into the DCTC computer database.

10.  On or about January 31, 2011, defendant **ANTHONY R. CHENG, JR.** and Anthony C.Y. Cheng Sr. met with Public Official Number One at Tony Cheng's Mongolian Restaurant. Public Official Number One provided defendant **ANTHONY R. CHENG, JR.**, with backdated Operating Authority Licenses for his multi-vehicle taxicab companies to make it appear as if the companies existed before the moratorium was in place.

11.  During the January 31, 2011, meeting, based on prior discussions with and at the direction of defendant **ANTHONY R. CHENG, JR.**, Anthony C.Y. Cheng Sr., reimbursed Public Official Number One with the $1500 in cash on behalf of defendant **ANTHONY R. CHENG, JR.**

12.  On or about February 16, 2011, defendant **ANTHONY R. CHENG, JR.**, spoke to Public Official Number One by telephone, at which time Public Official Number One advised and discussed with defendant **ANTHONY R. CHENG, JR.**, of the need to obtain backdated Certificates of Occupancy from the DCRA. Public Official Number One told defendant **ANTHONY R. CHENG, JR.**, that he had a contact at the DCRA who would be willing to provide

the backdated Certificates of Occupancy.

13.  As part of an undercover investigation, an undercover Special Agent of the Federal Bureau of Investigation (hereinafter, "Public Official Number Two"), was introduced and known to defendant **ANTHONY R. CHENG, JR.**, as a DCRA public official who had the authority to issue Certificates of Occupancy on behalf of the DCRA.

14.  On or about March 31, 2011, in the District of Columbia, defendant **ANTHONY R. CHENG, JR.**, met with and gave, offered, and promised a thing of value, to wit, $250, for or because of an official act that had been performed by Public Official Number Two. Specifically, Public Official Number Two provided two Certificates of Occupancy to **ANTHONY R. CHENG, JR.**, for his two multi-vehicle taxicab companies. After providing the $250 to Public Official Number Two, **ANTHONY R. CHENG, JR.**, acknowledged the improper purpose of the payment. Public Official Number Two explained that he intended to use the $250 to purchase an Apple iPad.

The $250 provided to Public Official Number Two was not authorized by law for the proper discharge of Public Official Number Two's duties, such as salary or other lawful compensation for a public official.

Respectfully submitted,
RONALD C. MACHEN JR.
United States Attorney
DC Bar No. 447889

By: /s/ Lionel Andre
Lionel Andre, D.C. Bar # 422534
Loyaan Egal, NY Bar
Assistant United States Attorneys
Fraud & Public Corruption
555 4th Street, N.W.
Washington, D.C. 20001
(202) 252-7818 (Andre)
(202) 252-7899 (Egal)
Lionel.Andre@usdoj.gov
Loyaan.Egal@usdoj.gov

## ANTHONY R. CHENG, JR.'S ACCEPTANCE

I have read every word of this Statement of Offense and carefully reviewed every part of it with my attorney. Pursuant to Fed. R. Cr. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense. I am fully satisfied with the legal services provided by my attorney in connection with this Statement of the Offense and all matters relating to it. I fully understand this Statement of the Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

Date: 4/16/14

ANTHONY R. CHENG, JR.

I have reviewed and discussed every part of this Statement of the Offense with my client, Mr. Anthony R. Cheng, Jr. It accurately and completely sets forth the Statement of the Offense agreed to by Mr. Anthony R. Cheng, Jr., and the Office of the United States Attorney for the District of Columbia. I concur with his decision to stipulate to this Statement of Offense.

Date: 4-16-14

Eric Kirchman, Esquire
Attorney for the Anthony R. Cheng, Jr.